**DYCO PETROLEUM CORPORATION, Apexco, Inc., Texas Oil & Gas Corp. and Amarex, Inc., Plaintiffs,**

v.

**The RUCKER COMPANY, a California Corporation, d/b/a Rucker Acme Tool, Defendants,**

**Arrow Pipe Service, Inc., an Oklahoma Corporation, Third-Party Defendant.**

**No. 76–134–C.**

United States District Court, E. D. Oklahoma.

Dec. 30, 1977.

Lance Stockwell, Tulsa, Okl., for plaintiffs.

Eugene P. Ledbetter, Jr., Alex Cheek, W. Samuel Dykeman, Oklahoma City, Okl., for defendants.

MEMORANDUM OPINION

MORRIS, Chief Judge.

The dispute in this case centers upon the drilling of a well for oil or gas in the Arkhoma Basin in Latimer County, Oklahoma. While the well was being drilled by a rotary rig the drill string parted and the well was lost. The heart of the dispute is what caused the 3½″ diameter drill string to part.

Dyco Petroleum Corporation, Apexco, Inc., Texas Oil and Gas Corp. and Amarex, Inc., hereinafter referred to as Dyco or plaintiff, were the owners of oil and gas leases on a tract of land in Latimer County, Oklahoma. Pursuant to the terms of an operating agreement (Plaintiff's Exhibit 5) Dyco Petroleum Corporation was named the operator for the four-company group and was responsible for the drilling of a well, known as the Golightly # 1. Dyco had drilled other wells in the area and anticipated that possible drilling problems might be encountered which would involve deviation of the well from the vertical and the sloughing of shale. The well was to be drilled using air as a circulating fluid instead of mud. Dyco entered into a contract to drill the well with Unit Drilling Company (Unit), a drilling contractor engaged in the business of drilling oil and gas wells for hire. The drilling contract was entered into between Dyco and Unit on October 24, 1975 (Plaintiff's Exhibit 6) and drilling started on that date. Drilling activity of one type or another was pursued for 105 days with February 8, 1976 being the day the pipe parted. On that day the drill bit was bottomed at 12,388′.

The drill pipe used in the early stages of drilling was 4½″ outside diameter drill pipe. The well was projected to test the Spiro formation at approximately 13,000′ (Plaintiff's Exhibit 5). Mr. Reeves, vice-president of drilling and production for Dyco, contacted Grover Pool, Tulsa city salesman for the defendant and told him in the latter part of December or in early January that Dyco would need 3½″ drill pipe. They talked two or three times. Dyco intended to rent the 3½″ drill pipe from the defendant and

Reeves told Pool that he wanted to rent drill pipe which was classified as premium. Premium drill pipe is the highest and best grade of used drill pipe and is second only to new drill pipe which has not been used.

Reeves also talked to Mr. Lamborn, with Unit, some two weeks prior to the time the 3½″ drill pipe was needed and told Lamborn to get in touch with the defendant concerning the drill pipe and instructed Lamborn to order 3½″ premium class drill pipe. Lamborn ordered the pipe from defendant in a phone conversation with Mr. Clinglesmith the day before the pipe was delivered. He ordered premium pipe; they had no discussion about any other class. The pipe was delivered by the defendant to the well site of the Golightly # 1 on January 15, 1976. When it was delivered it was receipted for by Mr. Ramsey, driller for Unit, who the parties stipulated was the authorized agent for both Dyco and Unit (Plaintiff's Exhibit 19).

The first 9800′ of the Golightly well were drilled with 4½″ drill pipe which had been supplied by Unit. Dyco knew that drilling in the area would be hazardous. Possible drilling problems which were foreseen were in fact encountered. On or about December 28, 1975, at a depth of approximately 9086′, the drill pipe twisted in two and again, on or about December 30 or 31, at approximately 9211′, the drill pipe again twisted off (Plaintiff's Exhibit 7). On each occasion the bit and section of the drill pipe which was left in the hole when it was twisted off and referred to in the industry as a "fish" was removed from the hole. After these fish were removed drilling continued to a depth of about 9800′. At that point shale fell in the hole, the drill bit became stuck and it was impossible to get it out of the hole. Attempts were made to free the stuck drill pipe. The bit was moved up off the bottom about 10 or 15 feet but it was impossible to get the drill pipe unstuck. Mr. Lamborn, who was in charge of all drilling operations for Unit, testified that at that point a downhole fire occurred and that the drill pipe was melted in two. And in order to avoid another

downhole fire 7″ casing was set. The drill pipe from the depth of 9389′ was pulled out of the hole, leaving a fish in the hole from that depth down to approximately 9800′. In other words, the fish, made up of drill bit, drill collars and drill pipe, was approximately 400′ in length. At 9389′ they deviated the well and commenced sidetracking and drilled around the fish to a depth of 9750′ and then set 7″ intermediate casing to a depth of 9600′. Approximately 200′ of 7″ casing which was cemented was thus set in the sidetrack hole between the depths of approximately 9400′ and 9600′. The bottom 200′ of the fish was in the original open hole and alongside the sidetrack hole which was also open below the depth of 9600′, the 7″ intermediate string of casing having been cemented only to a depth of 9600′.

The 4½″ drill pipe was then pulled out of the hole and the 3½″ drill pipe rented from the defendant was run in the hole and they proceeded to drill ahead. At a depth of approximately 10,800′ cones from the drill bit were lost in the hole and another fishing operation was necessary to get the cones out of the hole. Following removal of the cones, drilling continued forward to a depth of 12,388′. At that point additional drilling difficulties again were encountered. The drill bit again became stuck at 12,388′ due to sloughing shale.

Fishing operations were commenced in the early morning hours of February 8, 1975 to get the drill bit (the fish) unstuck and out of the hole. The fish was jarred loose and they started out of the hole with the fish on the end of the drill string. They had pulled 26 stands of pipe (each stand of pipe is approximately 92′ in length) when the drill pipe parted and the entire string of tools below the part fell approximately 2500′ into the hole. The drill bit was approximately 200′ below the bottom of the fish in the sidetracked hole when the drill string parted. The pipe parted approximately 2135′ down the hole from the surface of the ground (the rotary table). An additional 23 stands of drill pipe and one single joint which were above the point where the pipe parted were removed from the hole (Plaintiff's Exhibit 7 and Defendant's Exhibit 23). Attempts also were made to fish out the drill pipe and drilling tools which had fallen into the hole and approximately 1000′ of drill pipe was recovered. Both ends of the joint of drill pipe which had parted were recovered. The upper portion of that joint (Plaintiff's Exhibit 20) was subjected to various and numerous metallurgical tests. Diligent efforts were made to recover the several thousand feet of additional drill pipe which had fallen into the hole but they were unsuccessful and the well was plugged and abandoned on March 2, 1976 (Plaintiff's Exhibit 7).

The string of 3½″ drill pipe which parted was used drill pipe; it had been rented from the defendant. According to the quality standards promulgated by the American Petroleum Institute there are six classifications for drill pipe (Plaintiff's Exhibit 48, p. 61). New drill pipe is Class 1 and is not involved in this case. Used drill pipe has five classifications. Used drill pipe is periodically inspected and based upon the results of the inspection by the company inspecting the same, it is classified so that the user of the drill pipe will know the quality of the used pipe in question. When the inspecting company determines the quality of each joint of pipe it places a stencil on the pipe which indicates the classification for each joint of pipe inspected. Because the stencil is small and because the classification is shown by a punch mark on the outside of the pipe, the inspecting company paints a color band or bands on each joint so that the drilling crew which is using the pipe can easily and instantly determine the quality of pipe which is being placed in the hole. The classification and the color bands used are as follows:

| Drill Pipe Classification | Number and Color of Bands |
| --- | --- |
| Premium Class | Two White |
| Class 2 | One Yellow |
| Class 3 | One Blue |
| Class 4 | One Green |
| Scrap | One Red |

The color coding placed on the pipe at the time of inspection is not a lasting identifica-

tion mark; it is worn off in the drilling process by the rotation of the drill pipe in the hole. The stencil, a permanent identification mark, is placed on the pipe by the inspecting company; it is placed on the sloping shoulder of the tool joint pin and shows the month and year of inspection, the number of punch marks which indicate the classification and the sequential number assigned to that particular joint by the inspecting company. It also shows a symbol or an initial which identifies the company which conducted the inspection. One punch mark indicates premium, two punch marks indicate class 2, three punch marks indicate class 3, etc.

When the upper portion of the joint of pipe which parted was pulled out of the hole and examined (Plaintiff's Exhibit 20) a stencil was found on it showing that it had been inspected by Arrow Pipe Service, Inc. (Arrow) in June of 1975, that it had three punch marks and accordingly was classified as No. 3 instead of premium which had been ordered by plaintiff and by Unit. On the rack at the drill site were a number of 3½″ drill pipe joints which had not been run in the hole. Examination of those joints revealed that three of those joints also had a stencil with three punch marks on each joint indicating class 3 pipe. Each of those joints, however, had two painted white bands on it, indicating premium class pipe.

Subsequent to the date on which the pipe parted, further inspection was given to the upper section of the parted joint of pipe (Plaintiff's Exhibit 20) by both parties and it was found that there was a second stencil on the pipe by Arrow. The second stencil by Arrow revealed that the joint had been inspected in October of 1975, and classified as premium. Thus Arrow classified the joint in question as Class 3 in June and as Premium in October of the same year. The color coding which would have been placed on the pipe at the time of the October inspection would have been a double white band.

Subsequent to the day the pipe parted (February 8, 1976) and prior to trial, several additional inspections of the upper portion of the parted joint (Plaintiff's Exhibit 20), the mated end to Plaintiff's Exhibit 20, and the three joints of pipe on the rack at the well site and other joints of pipe recovered from the hole were conducted by various companies with the following results:

1. A report dated February 12, 1976 from AMF Tuboscope, Inc., to the plaintiff, shows that 51 joints of pipe on the rack at the drill site of the well (this included the three joints in question) were inspected and each of such joints was classified as premium. The remainder of the length of the 3½″ drill pipe which parted was inspected and found to be "in the class # 2 range." (Plaintiff's Exhibit 55).

2. A report dated March 22, 1976 by Arrow to the plaintiff, shows that the three joints of pipe which had been on the rack were inspected and were classified as No. 3 "due to internal pitting." (Plaintiff's Exhibit 16).

3. A report dated April 22, 1976 from AMF Tuboscope, Inc. to the defendant shows the same three joints of pipe were inspected and were classified as premium (Plaintiff's Exhibit 56).

4. A report dated May 3, 1976 from Plastic Applicators, Inc. to plaintiff shows an inspection of the same three joints of pipe and also a section of the parted joint of pipe. These four joints were classified as follows: The parted section of the pipe was classified as Class 4, two of the joints were classified as Class 3 and one of the joints was classified as Class 5, which is scrap (Plaintiff's Exhibit 24).

5. A report dated July 21, 1976, from Arrow to Southwest Metallurgical Consultants (expert consultants for plaintiff) shows that the three joints of pipe were classified as No. 3 due to pitting. The mated end to plaintiff's Exhibit 20 was classified as No. 2 (Plaintiff's Exhibit 51).

6. A report dated May 11, 1977 from Plastic Applicators, Inc. to defendant shows two of the three joints of pipe as Class 2

and one of those three joints was classified as premium. One length of pipe inspected was a portion of the parted joint in question. This length was downgraded to Class 5 due to the pin tool joint being twisted off and internal fatigue cracks. If this length had been a complete length and had not had fatigue cracks it should have been Class 2 due to outer diameter wear; it showed only minor internal pitting. This section was the mated end to plaintiff's Exhibit 20 (Defendant's Exhibit 5).

It is thus abundantly clear that a wide difference of opinion exists concerning the proper classification of the pipe in question. As to the parted joint of pipe that opinion ranges from Class 3 by Arrow in June of 1975 to Premium by Arrow in October of 1975 to Class 4 by Plastic Applicators in May of 1976 to Class 2 by Arrow in July of 1976 to Class 2 by Plastic Applicators in May of 1977. Similar disparity of opinion exists with respect to the three joints of pipe still on the rack at the time the drill string parted.

Mr. Joe H. Cunningham, President of Arrow, who formerly worked for AMF Tuboscope and who had 29 years of experience in this type of inspection work, admitted that there were a lot of grey areas in pipe inspection. He testified that making the correct classifications is not all black and white determinations and differences in classifications sometimes stem from different interpretations by different men who do the grading.

The plaintiff adduced testimony by two witnesses, Mr. Pierce and Mr. McElroy, who were or had been employed by the defendant, each of whom testified that on various occasions each of them had been instructed by their supervisor to change the color coding placed on pipe by an inspection company from a blue band to a double white band. They testified that this had occurred in the defendant's pipe yard and that pursuant to such instruction they removed the blue bands and painted on white bands. Mr. Pierce testified that he changed the

coding on three joints of pipe that were later delivered to plaintiff in January of 1976. He also testified that he was no longer employed by the defendant and had a workmen's compensation case pending against the defendant. Mr. McElroy testified that he was still employed by the defendant and that he had changed the color coding on pipe in defendant's pipe yard from blue to white. He could not identify any of the pipe delivered to plaintiff as pipe on which he had changed the color coding. Both witnesses testified that the stenciled punch marks were never changed.

Extensive evidence was introduced on both sides concerning the cause of the drill pipe failure. Dr. Jerner, a metallurgical engineer with excellent qualifications, testified as an expert witness for the plaintiff concerning the numerous and extensive tests, both destructive and non-destructive, which he performed on the joint of drill pipe which had parted. He also took numerous photographs. He had been asked by the plaintiff to determine, if he could, the cause of the separation of the pipe. On the basis of the various tests which he conducted and the photographs, he concluded that the joint of drill pipe in question had internal pitting, that it was corroded by hydrogen sulphide, that it had a fatigue crack which was present at the time it was delivered to the drill site, and that the pipe failed because of corrosion fatigue.

George L. Garwood, a metallurgical consultant, testified as an expert witness on behalf of the defendant. He, too, had examined the pipe in question in an attempt to determine the cause of the pipe failure. He concluded that the joint of pipe could be classified as either Premium or Class 2, that it had no fatigue cracks when the pipe was delivered to the well site, and that he saw nothing to show the presence of hydrogen sulphide. On cross examination he admitted that the Jerner photographs may show the presence of hydrogen sulphide, but in his view they do not reflect an accurate quantity. In his opinion the pipe failed because of what he called "impact loading,"

which he described as a circumstance which comes about when a piece of pipe is subjected to a rapidly applied load.

Dr. Murray also testified as an expert witness on behalf of the defendant and expressed the opinion that the drill string could have been pulled in two even if the pipe was Premium class.

When the Golightly # 1 was drilled there was an instrument on the drilling rig known as a geolograph. A geolograph is a recording device which records on a chart the rate of penetration of the drill bit and the weight in thousands of pounds which is placed on the drill string. Plaintiff's Exhibit 26 is a portion of the chart which was made on the Golightly # 1 which shows the stresses which were applied and what occurred for a period of approximately two days before and on the day the drill string parted. An enlargement of that portion of the chart which shows the events on the morning the drill string parted is shown by Defendant's Exhibits 11 and 47. In addition, plaintiff brought to the courtroom for a courtroom demonstration a geolograph so as to give the court a better insight into its operation. Plaintiff's Exhibit 9 was introduced to show that the yield strength (the weight at which the pipe would stretch) of premium and Class 2 pipe was 212,000 pounds and that the tensile strength (the weight beyond which the pipe might part) was 282,000 pounds. The yield and tensile strength of premium and Class 2 pipe are the same.

Plaintiff's witness, Mr. Lamborn, testified that the weight on the joint that parted was only 131,758 pounds, which was below both yield and tensile strength. The geolograph chart at 8:50 a. m. on February 8, 1976 (the date and time the drill string parted) shows the weight on the drill string to be 210,000 pounds. Mr. Lamborn, who had been employed by Unit for 23 years and was a vice-president, had considerable experience with geolographs. He expressed the view that the line showing 210,000 pounds of weight is not a correct reflection of actual weight; that when the pipe parted a surge was imparted into the instrument which caused the recording needle to move excessively to the right and not to show a true reflection of the weight. In his opinion the weight where the pipe parted was 131,758 pounds. He did admit on cross examination that exerting excess stress on a drill pipe can pull the pipe in two.

James O. Melton, who formerly taught for 15 years at the University of Oklahoma, and who held three full professorships in civil engineering at that institution, testified on behalf of the defendant. He testified that he had been a consultant for the Geolograph Company and had been involved with it in perfecting some 22 to 24 patents. He testified that over that period of time he learned about the geolograph "inside and out," both in the field and in the laboratory. He testified in detail concerning plaintiff's Exhibit 26 and after examining the geolograph chart for the morning of February 8, he testified that in his opinion the driller who was coming out of the hole with the pipe (making a trip) yanked hard on the pipe or it hung on him; that on the next stand of pipe he did the same thing, and that at 8:50 that morning he pulled 210,000 pounds and broke the pipe in two. In his opinion the red mark on the chart (Plaintiff's Exhibit 26) showing 210,-000 pounds is an accurate mark showing true weight and that the pipe was hung or the driller yanked on it and that the force of 210,000 pounds would not be reflected on the chart if at least that much true force were not there. He further testified that the driller encountered difficulty on the two stands of pipe which were pulled immediately preceding the stand which parted and that he was coming out of the hole rapidly when the pipe parted. In his opinion the reason the pipe parted was because it got hooked on something and the driller pulled on it and the pipe broke; he stated if it had not been hung he would not have had to pull on it so hard. He further expressed the opinion, based upon calculations which he performed, that in his view the real pull on the pipe was 261,000 to 265,000 pounds.

The driller, Mr. Ramsey, who was operating the draw works, testified that he was

coming out of the hole with the fish and just as he lifted this stand of pipe up off the slips it parted; that he had had no problems in pulling the 26 stands before this one and that he was in third gear. Mr. Lamborn had testified that the maximum load the motor on the draw works could pull in third gear was 213,520 pounds and Mr. Ramsey likewise so testified.

Mr. Burchhalter, vice-president and general manager of Falcon Drilling Company, and who had been in the drilling business for 25 years, dividing his work experience approximately one-half in the field and one-half in the office, testified on behalf of the defendant. He, too, was quite familiar with the operation of a geolograph and expressed the opinion upon examining plaintiff's Exhibit 26, that the driller was coming out of the hole with the pipe at a high rate of speed, ran into something and pulled the pipe in two. His interpretation of the chart was that the two previous stands of pipe which had been pulled show that the driller was dragging something as he came out of the hole with those stands. The defendant introduced into evidence its Exhibit 8, which is a diagram depicting what Mr. Burchhalter envisaged as the physical location of the fish in the original hole and the physical location of the side-tracked hole alongside the original hole and out of which the 3½″ drill pipe was being pulled. It is uncontroverted that approximately the bottom half of the fish was in an uncemented hole. Exactly how close in inches the sidetracked hole was to the original hole containing the fish is not known. Mr. Burchhalter testified that he thought the fish fell out and "grabbed him downhole" when he came to the loose fish in the original hole. In other words, it was his opinion that as the 3½″ pipe was being pulled from the sidetracked hole at a high rate of speed the fish in the original hole alongside the sidetracked hole caught on the pipe and jerked it in two.

On rebuttal Mr. Sam Bryan, a metallurgist for more than thirty years, testified on behalf of the plaintiff. He was at the Jerner Laboratory when the tests were performed. He reviewed those tests and he heard the testimony in the courtroom. In his opinion the failure of the pipe was caused by the presence of a fatigue crack in brittle pipe, which in his opinion was present when the joint of pipe was taken to the Dyco well. He further testified that the joint of pipe was corroded throughout. In his opinion plaintiff's Exhibit 20 (the upper portion of the failed joint) was not capable of withstanding normal loads and pressures which were encountered in the well.

Robert D. Grace, a consulting petroleum engineer, also testified on rebuttal on behalf of the plaintiff. He had wide experience and had been involved in the drilling of some 300 or 400 wells in the Arkhoma Basin. He had also had considerable experience with the geolograph and expressed the opinion, upon examining plaintiff's Exhibit 26, that no obstacle was encountered when the drill string came out of the hole. In his opinion there was no indication on the geolograph that a fish in the hole encountered the drill pipe as it came out of the hole. He further expressed the opinion that it was not an imprudent practice for the driller to come out of the hole at the rate shown on the geolograph.

Mr. Melton was called in rebuttal by the defendant and again stated his opinion to be that the driller was coming out of the hole at a fast rate of speed and that the drill string hooked on something and was pulled in two.

This case was tried to the court without a jury. The court has jurisdiction by reason of diversity of citizenship and the amount in controversy. Plaintiff seeks to recover damages from the defendant on five theories, which are:

1. Manufacturers' Products Liability, based on *Kirkland v. General Motors Corp.*, 521 P.2d 1353 (Okl.1974);

2. Negligence;

3. Misrepresentation, fraud and deceit;

4. Breach of implied warranty of merchantability;

5. Breach of contract.

The defendant denies liability on each of these theories and counterclaims against the plaintiff seeking recovery for the rental value of the drill pipe rented to plaintiff and the value of the pipe which plaintiff failed to return to the defendant.

Plaintiff seeks compensatory damages in the amount of $1,500,000 and punitive damages in the amount of $1,000,000. The defendant on its counterclaim seeks damages in the amount of $144,753.49 plus interest. Both sides have filed detailed and helpful trial briefs and proposed findings of fact and conclusions of law. Oklahoma law applies to all plaintiff's claims.

*Manufacturers' Products Liability.*

The Supreme Court of Oklahoma in *Kirkland v. General Motors Corp., supra,* set forth the essential elements of recovery under what it denominated as a manufacturers' products liability theory. The elements as stated by the court are as follows:

*First* of all Plaintiff must prove that the product was the cause of the injury; the mere possibility that it might have caused the injury is not enough.

*Secondly,* Plaintiff must prove that the defect existed in the product, if the action is against the manufacturer, at the time the product left the manufacturer's possession and control. *Thompson v. Trane Co.,* Okl., 500 P.2d 1329 (1972). If the action is against the retailer or supplier of the article, then the Plaintiff must prove that the article was defective at the time of sale for public use or consumption or at the time it left the retailer's possession and control.

*Thirdly,* Plaintiff must prove that the defect made the article unreasonably dangerous to him or to his property as the term "unreasonably dangerous" is above defined.

*Kirkland* at 1363.

■ It is thus clear that essential to plaintiff's recovery in this case is proof by a preponderance of the evidence that a defect in the drill pipe existed at the time the defendant delivered the drill pipe to the plaintiff and that the defect caused plaintiff's injury.

■ The testimony concerning the existence or absence of a defect is in irreconcilable conflict. There is testimony that the joint of pipe in question was not defective and was premium class. The most recent stencil placed on the pipe (October 1975) by Arrow before it was used classifies it as premium. On the other hand, there is testimony that the pipe in question had a corrosive fatigue crack or cracks, was defective and was Class 3 or Class 4.

A similar divergence of opinion exists on the question of proximate cause, although the parties are in substantial agreement on the meaning of proximate cause. They direct the court's attention to *Porter v. Norton-Stuart Pontiac-Cadillac of Enid,* 405 P.2d 109, 113–14 (Okl.1965) where the Oklahoma Supreme Court stated that proximate cause of any injury to person or property

must be the efficient cause which sets in motion the chain of circumstances leading to the injury; if the negligence complained of merely furnishes a condition by which the injury was possible and a subsequent act caused the injury, the existence of such condition is not the proximate cause of the injury. (Citation omitted). The proximate cause of an event must be understood to be that which in the natural and continuous sequence, unbroken by any independent cause, produces that event and without which that event would not have occurred.

and to *Woodward v. Kitchen,* 446 P.2d 375, 378 (Okl.1968) where the court stated:

The proximate cause of any injury must be the efficient cause which sets in motion the chain of circumstances leading to the injury and if the negligence merely furnishes a condition by which the injury was possible and a subsequent independent act caused the injury, the existence of such condition is not the proximate cause of the injury.

Expert witnesses on both sides, who appeared to the court to be candid, capable and forthright, reached diametrically opposite views on the question of causation.

The plaintiff's experts were of the opinion that the joint of pipe parted because of corrosion fatigue and the presence of a fatigue crack in brittle pipe. The defendant's experts were of the opinion that the pipe had been subjected to "impact loading" and had been pulled in two when it was being pulled from the hole at a high rate of speed and encountered something in the hole, which one witness believed to be the fish which remained in the original hole alongside the sidetracked hole.

The burden of proof is upon the plaintiff to persuade this court by a preponderance of the evidence that a defect in the pipe was the cause of plaintiff's injury. Plaintiff's proof has failed in this regard. Plaintiff has not satisfied the court that a defect in the parted joint of pipe existed. Furthermore, assuming a defect did exist, plaintiff has not satisfied the court that such defect was the proximate cause of plaintiff's injury. The court accordingly must find that the plaintiff can not recover against the defendant on a manufacturers' products liability theory.

### Negligence.

■ For the reasons more fully elaborated above, the court finds that the plaintiff has not proved by a preponderance of the evidence that the defendant was guilty of negligence or that the negligence, if any were to exist, was the proximate cause of the injury which plaintiff sustained.

### Misrepresentation, Fraud and Deceit.

■ Plaintiff did adduce uncontroverted proof and the court finds that the defendant did on some occasions remove blue colored painted bands on drill pipe situate in defendant's pipe yard and replace those blue painted bands with double white bands so as to indicate that the pipe was premium class. Plaintiff has failed to prove by a preponderance of the evidence, however, that the joint of pipe which parted had its color coding changed by the defendant from a blue band to a double white band and the court finds that the defendant did not so change the color coding on that joint of

pipe. The most recent stencil on that joint of pipe before it was placed in the hole (October 1975) classified it as premium. At that time when Arrow, who made the inspection, determined that joint of pipe to be premium class, it no doubt followed its usual and customary practice, as testified to by its president, Mr. Cunningham, and thereupon placed double white bands on the joint of pipe at the same time it stenciled the joint of pipe with a single punch mark. Accordingly, the court finds that no false or fraudulent representations were made by the defendant to the plaintiff concerning the classification of the joint of drill pipe which parted and the defendant was not guilty of misrepresentation, fraud or deceit so far as that joint is concerned. If the defendant were guilty of misrepresentation, fraud or deceit as to the three joints of pipe located on the rack at the drill site of the Golightly # 1, plaintiff has not been injured because it is uncontroverted and the court finds that those joints of pipe remained on the rack and were never used in the drilling of the Golightly # 1.

### Implied Warranty of Merchantability.

■ In Oklahoma the Uniform Commercial Code, 12A O.S.A. § 2–314, provides in part as follows:

(1) Unless excluded or modified (Section 2–316), a warranty that the goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind. . .

(2) Goods to be merchantable must be at least such as

.　　.　　.　　.　　.

(c) are fit for the ordinary purposes for which such goods are used; . . .

Whether this provision applies to a lease or rental transaction such as this one has not been decided by the Oklahoma Supreme Court. The court assumes without deciding that such statute would so apply. The court finds that the plaintiff has failed to prove by a preponderance of the evidence that the defendant breached its warranty. Plaintiff simply has not proved that the

joint of pipe in question was unfit for the purpose for which it was used. Moreover, plaintiff has failed to prove by a preponderance of the evidence "injury to . . . property proximately resulting from any breach of warranty." 12A Okla.Stat. § 2–715(2)(b).

*Breach of Contract.*

■ Plaintiff argues that the defendant contracted to deliver to plaintiff 439 joints of Premium Class 3½″ pipe, that it breached this contract in that it failed to deliver such pipe; that in fact defendant delivered to plaintiff an unknown number of joints of inferior quality, including the joint which failed. The court finds that the plaintiff has failed to prove by a preponderance of the evidence that the joint of pipe in question which parted while being pulled from the hole was not premium class. And even if it be assumed that such joint of pipe was not premium class, plaintiff has failed to prove that such breach resulted in plaintiff's injury. Plaintiff has simply failed to prove a breach of contract which resulted in a consequential loss.

## DEFENDANT'S COUNTERCLAIM

The defendant has counterclaimed against Dyco asserting that Dyco owes the defendant the sum agreed upon as rent for the use of the 3½″ drill pipe, drill collars, etc. and the value of the pipe which was lost in the hole and not returned to defendant. The record shows that 439 joints of 3½″ drill pipe were delivered to the plaintiff (Plaintiff's Exhibit 19 and Defendant's Exhibit 9).

Plaintiff in its brief contends that the defendant is not entitled to recover the rental value or the value of the drill pipe lost. Plaintiff contends that the defendant did not perform the contract according to its terms in that it did not deliver the ordered number of joints of premium class drill pipe. This, plaintiff argues, constitutes a failure of consideration; that its drill string is no stronger than its weakest joint and that accordingly when "the inferior joint, the one which parted, was placed in a drill string consisting of premium class drill pipe, the drill string instead became no stronger than a string of class 3 drill pipe. Thus, what was once good consideration, i. e., in excess of 400 joints of premium class drill pipe, became worth no more than 400 joints of class 3 drill pipe for use in the Golightly # 1. . . . Since the consideration failed, and that failure was through the fault of Rucker Acme, Rucker Acme can not now be allowed to recover rental for what should have been a string of premium class drill pipe, but instead became only a string of class 3 drill pipe. . . . Since it was Rucker Acme's fault that nearly 7,000 feet of drill pipe and drill collars were irretrievably lost in the Golightly # 1, it hardly seems equitable to compel Dyco to reimburse Rucker Acme for the value, or rental, of that pipe." (Plaintiff's Trial Brief, pp. 24–25).

There is no evidence before the court and indeed Dyco does not contend that any of the drill pipe delivered by the defendant except the joint which parted and the three joints which were not used and which were on the rack at the drill site were anything other than premium class pipe and the court finds that such pipe delivered by the defendant was premium class. With respect to the four joints in question, in order for the defendant to recover against Dyco on its counterclaim, it is necessary for it to prove by a preponderance of the evidence that those four joints of pipe were premium class, as represented, in order to recover the rental value of those four joints; this it has failed to do.

■ The burden of proof is upon the claimant with respect to its claims and theories of recovery and likewise the burden of proof is upon the counterclaimant with respect to its claim. The court found, for example, on plaintiff's first theory of recovery that it had failed to prove by a preponderance of the evidence that the joint of pipe in question was defective. The court did not find that joint of pipe was not defective. The court simply found that plaintiff failed to prove that it was defective, which was plaintiff's burden. The ex-

pert testimony outlined by the court earlier in this opinion concerning the proper classification of these four joints of pipe is in direct conflict. The court does not find that they were not premium class. The court does find that defendant has failed to prove by a preponderance of the evidence that these four joints of pipe were premium class pipe joints. The court further finds that the rental charged by the defendant was calculated on the basis that they were premium class pipe joints. Having failed in its burden of proof in this regard, defendant is not entitled to recover the rental value for premium class pipe as to these four joints.

Defendant, on its counterclaim, is accordingly entitled to recover the total sum of $144,733.49 as shown in Defendant's Exhibit 9, less the rental value for 45 days of the four joints of pipe in question. Of the four joints, an examination of Defendant's Exhibit 5 reveals that the parted joint and one of the three joints taken from the rack were 3½" O.D. 368" wall 13.3 lbs./ft. grade E pipe. According to Defendant's Exhibit 9, plaintiff rented 278 joints of grade E pipe, including these two joints, for 31 days at a cost of $9,327.90. The 278 joints were then rented for an additional 14 days at a cost of $4,193.27. Therefore, the cost of renting one length of pipe during the 31 day period was $33.55 and the cost of renting the same length for 14 addition days was $15.08. Thus, the cost of renting the two joints of grade E pipe for 31 days was $67.10 and for 15 additional days was $30.16, totalling $97.26 for the entire 45 day period. This $97.26 figure represents the 45-day rental cost for the two joints of grade E pipe, which includes the parted joint and one joint from the rack. In accordance with the court's ruling that defendant is not entitled to recover the rental for these two joints, $97.26 should be deducted from the sum sought on the counterclaim.

As to the remaining two joints, both taken from the rack, Defendant's Exhibit 5 shows that this pipe was 3½" O.D. 368" wall 13.3 lbs./ft. grade S-135. Plaintiff rented 161 joints of such pipe, including the two joints in question, for 31 days at a cost of $7,383.12. The rental period was then extended for 14 days at an additional cost of $3,334.31. See Defendant's Exhibit 9. The rental cost for one joint of grade S-135 pipe for 31 days would be $45.85 and for 14 days would be an additional $20.71. Therefore, the cost of renting the two joints of S-135 pipe was $91.70 for 31 days and $41.42 for the additional 14 days, totalling $133.12 for the entire 45 days. Defendant is not entitled to recover this amount.

Accordingly, the total rental value of the two joints of E pipe and the two joints of S-135 pipe for the entire 45-day period was $230.38. As defendant has not proven that it is entitled to the rental cost for these four joints, this amount should be deducted from the relief sought on the counterclaim.

The court accordingly finds and concludes that the defendant is entitled to recover on its counterclaim the sum of $144,503.11, plus interest at the rate of 1% per month from July 1, 1976, plus a reasonable attorneys' fee (Plaintiff's Exhibit 19. See back of page of said exhibit under heading, "Terms of Payment.") to be determined by the court on motion of the defendant.

Judgment will be entered in accordance with this opinion.