**Ricky Dale CANADY, Plaintiff–Appellee,**

v.

**J.B. HUNT TRANSPORT, INC., Defendant–Appellant.**

**No. 91–6059.**

United States Court of Appeals, Tenth Circuit.

July 13, 1992.

---

Earl H. Remmel, Williams & Remmel, Oklahoma City, Okl. (Patrick J. Malloy III of Malloy & Malloy, Inc., Tulsa, Okl. and Leslie V. Williams, Jr., Williams & Remmel, Oklahoma City, Okl., on the brief), for plaintiff-appellee.

Walter M. Bower of Bower & Weeks, Oklahoma City, Okl. (Richard J. Goralewicz of Turner, Turner & Braun, Oklahoma City, Okl., on the brief), for defendant-appellant.

Before BARRETT and SEYMOUR, Circuit Judges, and HUNTER, Senior District Judge.*

ELMO B. HUNTER, Senior District Judge.

Jurisdiction in the district court was invoked pursuant to 28 U.S.C. § 1332. On December 20, 1990, the jury rendered judgment against J.B. Hunt Transport, Inc., ("Hunt") Appellant. On February 5, 1991, Hunt commenced this appeal. Jurisdiction in this court is invoked under 28 U.S.C. § 1291. The judgment of the district court is affirmed.

* Honorable Elmo B. Hunter, Senior United States District Judge for the Western District of Missouri, sitting by designation.

## STATEMENT OF FACTS

Ricky Dale Canady ("Canady") became an employee of Hunt on July 7, 1988. In June of 1989, Canady became a driver/trainer for Hunt. During June, Canady asserts that his knee "popped" while getting his wallet out of the truck to make a phone call. After the accident, Canady's supervisors instructed him to go to Dallas, Texas, to be examined and treated by Hunt's doctor. The doctor put Canady's knee in a brace and advised him to see his personal doctor, Dr. Muse. Dr. Muse then performed surgery on Canady's knee. Following surgery, Canady spent three months in therapy.

Canady filed a workers' compensation claim immediately after he was advised that he needed surgery. Consistent with Hunt's policy to terminate employees injured on the job if they did not return to work within sixty days of the injury, Canady was terminated when he failed to return to work within the sixty day time period. Also consistent with Hunt's policy, Canady was advised that he would be reinstated after he had obtained a full and complete medical release from his doctor. On October 27, 1989, Canady received a complete medical release from his doctor and Canady delivered the release to Hunt. Hunt's policy required Canady to take a Department of Transportation ("DOT") physical prior to reinstatement. Canady was never provided the opportunity to take the DOT physical and, on November 10, 1989, Canady was advised that he would not be reinstated. Canady called Debbie Thurman, the Workers' Compensation Coordinator for Hunt, to see why he would not be reinstated.

Thurman asserts that she told him that the doctor's records showed that his knee would deteriorate if he went back to work. Donnie Acree, the terminal manager, testified that Hunt wanted Canady rehired after his medical problems were resolved. Charles Duncan, fleet manager at Hunt, testified that he was anxious to have Canady back on the job and that it "is absolutely not" the policy of Hunt to discharge drivers who are injured for prolonged periods of time. Tim Kohl, personnel manager at Hunt, testified that there was a letter from Dr. Muse which contradicted Dr. Muse's medical release. Kohl's area of concern was that "Canady had a 31% disability rating to a part of his body, his leg, his knee, which is a very high disability rating, which would indicate that there could be a problem down the road." Additionally, Kohl was concerned with the doctor's statement that Canady "should refrain as much as possible from, you know, load varying activity on that knee." Kohl concluded by stating that he made a decision not to rehire Canady based upon the treating physician's recommendation and Dr. Applegate's opinion.[1]

The day after being advised that Canady would not be reinstated, Canady filed for unemployment. Hunt opposed the unemployment claim based upon the admittedly false allegation that Canady had never delivered a medical release to the company. The evidence showed that, after being advised that he would not be reinstated and discovering that Hunt continued to contest his unemployment claim, Canady remained at home, survived on loans from his sisters, and experienced a period of emotional distress before finding a job.

Canady commenced his employment with Halliburton Oil Field Services ("Halliburton") on or about December 1, 1989, as a truck driver. Prior to his employment with Halliburton, Canady took and passed a DOT physical. Canady asserts that his employment with Halliburton is more physically strenuous and demanding than his job with Hunt, and that he has had no problems with his knee. Canady testified that because of his workers' compensation claim, he was denied employment at "six or seven" different locations, and because of Hunt's refusal to reinstate, he lost his apartment and car insurance.

Dr. Muse testified, by videotaped deposition, that he dismissed plaintiff from his

---

1. Dr. Applegate was retained by Hunt to examine Canady's records, but never physically examined Canady.

care on October 27, 1989, and delivered a complete release to return to work to plaintiff. Dr. Massad testified, via videotaped deposition, that he had seen plaintiff, on behalf of defendant, for the purpose of evaluating his on the job injury and that he had prepared a narrative report with respect to plaintiff's condition on January 29, 1990. Dr. Massad concluded that plaintiff's period of temporary total disability had ended; plaintiff had reached "maximum medical benefits from this treatment"; and he saw no need for any type of rehabilitative process. Dr. Massad testified that plaintiff has an average range of flexion/extension; that there had been no fluid or swelling on his knee; the ligaments within the knee's structure appeared to be normal; there was no noted tenderness; there had been no motor or sensory deficits; there was no crepitus or patellar grinding; achilles tendon and calf function were normal; his gait and coordination were within normal limits; no motor weakness; no muscle atrophy or wasting noted; the knee was normal from an extension point of view; and plaintiff had a 5% disability to the body as a whole.

Gary Barnes, plaintiff's accountant, testified with regard to the computation of plaintiff's lost income and difference of the rate of pay at new and old jobs. His calculation for present value of lost future income was $28,150.28; lost past income was $10,281.60; and a credit against these sums was assessed at $3,906.32 for temporary income earned by plaintiff. He further subtracted $372, which represented two weeks of unemployment compensation. Thus, plaintiff's final net loss of income was approximately $34,000.

David Calvert testified that he was terminated from his employment from Hunt on November 12, 1988, after he had sustained an on-the-job injury on October 25, 1988. On November 7, 1988, Calvert called his supervisor, J.D. Perry, who advised him that "I would drop this medical shit and find a job elsewhere because I was fixing to get a bad deal." Perry further advised Calvert that if he filed a workers' compensation claim against Hunt, he would lose.

Calvert then called Mrs. Hunt, one of the Hunt owners, who arranged for a conference call with Calvert, Perry and Charles Duncan, the assistant acting terminal manager. Calvert advised Mrs. Hunt of Perry's remarks and Perry confirmed that he had made those remarks. Perry stated that he had conveyed to Calvert what Duncan had instructed. Mrs. Hunt advised Calvert that he was not being terminated at that time. On the same day, Calvert employed a workers' compensation attorney and then saw a physician on November 9, 1988. On November 12, 1988, Calvert called the company and was advised by Donnie Acree that he would be terminated.

Perry was called as a rebuttal witness for plaintiff and testified that he worked for Hunt for one year as a dispatcher. Perry's testimony corroborated the testimony of Calvert and contradicted the testimony of defendant's witnesses. Perry testified that Calvert advised him of the on-the-job injury before he notified Calvert that he was terminated. Perry further testified that he advised the fleet manager, Duncan, that Calvert had been hurt on the job and that Duncan's response was "well, if he pursues this, it's going to cost him his job." Perry further testified about the conference call, which occurred about four or five days after his conversation with Calvert. Prior to that conference call, Perry had not been advised that Calvert had been terminated, as Hunt asserts. Perry testified that he quit his job because he didn't believe that the company treated drivers fairly and that the company had an unwritten policy that if a driver was "going to be expensive, it was better that maybe they worked somewhere else."

## I. SUFFICIENCY OF THE EVIDENCE TO SHOW THAT PLAINTIFF'S DISCHARGE WAS MOTIVATED BY RETALIATORY INTENT

■ Defendant argues that the evidence was insufficient to (1) show plaintiff's discharge was motivated by retaliatory intent; (2) show Canady was able to perform his duties of employment; and (3) support an

award of compensatory damages in the amount of $21,250.

This is an action for retaliatory discharge, arising under Oklahoma's Workers' Compensation laws. The burden of proof is upon the plaintiff with respect to his claims and theories of recovery. *Dyco Petroleum Corp. v. Rucker Co.*, 443 F.Supp. 685, 695 (E.D.Okla.1977). The question is whether there is evidence, viewed in the light most favorable to the plaintiff, upon which the jury can properly find a verdict for plaintiff. *Mackey v. Burke*, 751 F.2d 322, 325 (10th Cir.1984). Further,

> jury verdicts are not to be lightly overturned.... Judgment N.O.V. is proper only when the evidence so strongly supports an issue that reasonable minds could not differ.... The court cannot weigh evidence, consider the credibility of witnesses or substitute its judgment for that of the jury.

*Ware v. Unified School District*, 881 F.2d 906, 911 (10th Cir.1989).

In essence, Canady has "the burden of proving that retaliation for the exercise of rights granted under the Workers' Compensation Act play a *significant part* in the employer's decision to terminate" him. *Thompson v. Medley Material Handling, Inc.*, 732 P.2d 461, 463 (Okla.1987) (emphasis added).

■ Canady may meet his burden of persuasion, by showing that he was a victim of retaliatory discharge, "either directly by persuading the court that the discharge was significantly motivated by retaliation for her exercise of statutory rights, or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Id.*

After Canady has established a prima facie case, the burden shifts to Hunt to rebut the inference that its motives are retaliatory, by articulating a legitimate non-retaliatory reason for the discharge. *Bishop v. Hale–Halsell Co., Inc.*, 800 P.2d 232, 234 (Okla.1990).

For Hunt to raise a genuine issue of fact, it

> must set forth clearly, through the introduction of admissible evidence, the reasons for the employee's termination. The explanation provided must be legally sufficient to justify entering judgment for the employer. If the employer carries this burden of production and the presumption raised by the prima facie case is rebutted, then the factual inquiry proceeds to a new level of specificity.

*Id.*

If Hunt carries the burden of production in overcoming Canady's prima facie case of retaliatory discharge, Canady has an opportunity to show that the employer's proffered reason for termination was not the true reason for the employment decision, but, rather, was pretextual. *Buckner v. General Motors Corp.*, 760 P.2d 803, 807 (Okla.1988). However, the ultimate burden of persuasion remains with Canady at all times, though. *Id.*

The medical testimony solicited from the two doctors who examined Canady established that he was capable of performing his work in November of 1989, whereas Hunt advised Canady that the refusal to reinstate was based upon Dr. Applegate's conclusion that Canady was a poor risk, even though Dr. Applegate never examined Canady. Canady received a complete medical release from Dr. Muse on October 27, 1989, and delivered the release to Hunt for reinstatement. Hunt violated its own internal policies by denying Canady the opportunity to take a DOT physical.

Dr. Applegate testified that he was not board certified in the area of orthopedics and Dr. Muse, who had performed surgery on plaintiff's knee, was better qualified to testify with regard to plaintiff's knee than he was. Dr. Massad testified that he had been retained by Hunt to examine Canady in connection with his workers' compensation claim, and that Canady's period of total disability had ended and his examinations revealed "normal" movement of the knee.[2] The jury was entitled to conclude

---

**2.** The trial court's findings and conclusion with regard to Dr. Massad's testimony were that:

> the defendant, having hired Dr. Massad to fight the workers' compensation case, was it-

that Hunt gave Canady a false and/or pretextual reason for not allowing him to return to work, because he had employed an attorney; filed a good faith workers' compensation claim; and because Hunt opposed unemployment compensation on an admittedly false basis. *See Buckner*, 760 P.2d at 808 and *see e.g. Thompson v. Medley Material Handling, Inc.*, 732 P.2d 461 (Okla.1987).

Additionally, there was direct evidence of a pattern of retaliatory conduct. Perry's testimony corroborated Calvert's testimony that he was terminated because he pursued a workers' compensation claim. Additionally, Perry's testimony contradicted the testimony of defendant's witnesses, relative to facts and circumstances surrounding Calvert's termination. The evidence establishes that the refusal to reinstate Canady was motivated by retaliatory intent and based upon false and pretextual reasons.

Hunt asserts that the evidence was insufficient to show that Canady was unable to perform the duties of his employment, therefore, Hunt was not obligated to reinstate him, pursuant to Oklahoma law. *Pierce v. Franklin Elec. Co.*, 737 P.2d 921, 925 (Okla.1987). The evidence clearly shows that Canady was able to perform his duties and should have been given the opportunity to take a DOT physical.

■ Defendant asserts that the evidence does not support the award of actual damages. Canady prayed for damages resulting from emotional distress and loss of income. Mental anguish damages may be recovered under the Oklahoma Workers' Compensation Act when an employee is discharged for filing workers' compensation claim. *Malik v. Apex International Alloys, Inc.*, 762 F.2d 77, 80 (10th Cir.1985). Emotional distress is an intangible damage, and is an issue of fact within the providence of the jury. *Chandler v. Denton*, 741 P.2d 855 (Okla.1987) (wherein, the Supreme Court of Oklahoma upheld a jury verdict for mental distress of $500,000). Additionally, Canady's expert testified that Canady's final loss of past and future income was $34,000. The jury was the trier of fact in this case and its verdict is not inconsistent with the evidence. The sum awarded is supported both by the evidence of lost income and the evidence of emotional distress.

## II. AWARD OF PUNITIVE DAMAGES

■ Defendant asserts that the jury's award of punitive damages was inappropriate.

The complaining party is allowed to recover exemplary damages not because his position is meritorious but because society is benefited by deterring similar conduct (citations omitted). If no societal benefit is to be derived from the imposition of exemplary damages, all legal justification for the award collapses. *Nixon v. Oklahoma City*, 555 P.2d 1283, 1985 (Okla.1976). "[I]t takes little foresight to acknowledge that a person whose employment is terminated is going to suffer mental anguish, embarrassment and even humiliation." *Williams v. ABS Enterprises, Inc.*, 734 P.2d 854 (Okla.App.1987). In the absence of the deterrent effect of punitive damages, there would be little to dissuade Hunt from engaging in the practice of discharging other employees for filing workmens' compensation claims. *Webb v. Dayton Tire & Rubber Co.*, 697 P.2d 519, 523 (Okla.1985). The award of punitive damages are appropriate under these facts and circumstances.

## III. THE PROPRIETY OF DENYING DEFENDANT'S MOTION FOR JUDGMENT NOTWITHSTANDING THE VERDICT

The standard for denying a motion for judgment notwithstanding the verdict is as follows:

The question is not whether there is literally no evidence supporting the party against whom the motion is directed but whether there is evidence upon which the jury could properly find a verdict for that party (citations omitted). We must view

---

self snookered by Dr. Massad's testimony when he testified that plaintiff's injury was

insubstantial. In this, the defendant will have to accept the bitter with the sweet.

the evidence in the light most favorable to plaintiffs as the party against whom the motions were made. *Mackey v. Burke*, 751 F.2d 322, 325 (10th Cir.1984). The evidence previously cited in this opinion supports the jury's verdict and the trial judge did not err in denying defendant's motion for judgment notwithstanding the verdict.

## IV. PROPRIETY OF THE TRIAL COURT'S DENIAL OF HUNT'S MOTION FOR NEW TRIAL BECAUSE OF UNFAIR PREJUDICIAL SURPRISE

█ Hunt argues that Perry's testimony was prejudicial and a surprise. A motion for new trial is addressed to the sound discretion of the trial court and the granting or denial of such a motion will not be disturbed on appeal except for manifest abuse of discretion. *McCullough Tool Co. v. Well Surveys, Inc.*, 343 F.2d 381, 410 (10th Cir.1965) and *see also Holmes v. Wack*, 464 F.2d 86 (10th Cir.1972). Here, proof of retaliatory discharge turned on the evidence and testimony that Calvert was also a victim of retaliatory discharge. Critical to Calvert's testimony was a conference call involving Mrs. Hunt, Calvert, Duncan and Perry. Hunt's witnesses denied Calvert's version of this conference call. Perry's testimony rebutted Hunt's evidence with respect to the conference call and Duncan's denial of threatening Calvert with the loss of his job if he continued to pursue his compensation claim. Perry's testimony did not go beyond the testimony elicited from Hunt's witnesses and was purely rebuttal. *McGaha v. Mosley*, 283 S.C. 268, 322 S.E.2d 461, 466 (App.1985). There was no clear error or abuse of discretion in denying the request for a new trial.

Accordingly, the decision of the district court is AFFIRMED.